IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                         Cr. No. 02-1592 JP

BRIAN MADDOX,

        Defendant.

## MEMORANDUM OPINION AND ORDER

On November 8, 2002 Defendant Brian Maddox filed a Motion to Suppress Evidence Seized in Violation of the Fourth Amendment (Doc. No. 21).  Defendant argues that the pistol, methamphetamine, and scale in his possession on July 12, 2002 cannot be used as evidence in his criminal trial because the police gathered these items during an illegal detention.  On January 16, 2003 a hearing was held on Defendant's Motion.  The parties submitted post hearing briefs. Having considered the briefs and the evidence presented during the hearing, the Court concludes that Defendant's Motion should be denied.

**FACTS**

On July 12, 2002 Bernalillo County Sheriff's Deputy Anthony Medrano drove to 5701 Douglas S.W. in Albuquerque, New Mexico to serve a felony arrest warrant for drug trafficking on Rachel Page.  United States Deputy Marshals Adam McGovern and Fred Garcia accompanied Deputy Medrano.  The law enforcement officers arrived at 5701 Douglas S.W. at approximately

8:45 p.m. in an unmarked vehicle belonging to the Bernalillo County Sheriff's Department. At that time it was dusk, on the verge of getting dark.

The residence at 5701 Douglas S.W. was a mobile home that belonged to Richard Buhlre Sr. The dwelling was known by law enforcement officers to be a place where criminal activity had occurred and where police officers had regularly been previously.

As Deputy Sheriff Medrano and Deputy Marshals Adam McGovern and Fred Garcia drove into the driveway and up to the mobile home they saw a man near the carport. After they alighted from the vehicle to speak with this person, another man, Richard Buhlre, Jr. approached the police officers. Deputy Sheriff Medrano told the men that they were looking for Rachel Page. Richard Buhlre Jr. told the officers that Rachel Page was inside the mobile home. At that point Deputy Marshal Garcia, who was carrying a rifle in a tactical sling, and Deputy Marshal McGovern went inside the mobile home to arrest Rachel Page while Deputy Sheriff Medrano remained outside with the two men. Deputy Sheriff Medrano patted the men's clothing for weapons and had them sit on the ground in the area of the carport near the mobile home.

Shortly thereafter Daniel Southall drove a pick-up truck up the driveway to the mobile home. Defendant was seated in the front passenger seat and Jennifer Torres was seated in the rear seat. As the pick-up truck came to a stop, Deputy Medrano saw Defendant reach down toward the floorboard of the truck but did not see Defendant pick up anything. When Daniel Southall got out of the driver's side of the truck Deputy Sheriff Medrano directed him to the area of the carport where the other two men were seated. Deputy Sheriff Medrano then told Defendant and Jennifer Torres to get out of the pick-up truck and go to the area of the carport. Deputy Sheriff Medrano asked the occupants of the pick-up truck to sit on the ground with the

two men because (1) he was concerned about the number of people present outside the dwelling, (2) he knew the place had a history of criminal activity, and (3) he felt that it was dangerous both for himself and the Deputy Marshals inside the mobile home for people to roam around the area freely.

During the time the Deputy Marshals were inside the mobile home, Deputy Sheriff Medrano watched over the five persons in the area of the carport. Deputy Sheriff Medrano observed that Defendant paced around in circles and looked repeatedly towards a mobile home that was behind and some distance away from the Buhlre's mobile home. By this time it was dark. A few minutes later a sixth person arrived and Deputy Sheriff Medrano had him join the others in the carport area. Eventually Deputy Sheriff Medrano detained as many as eight persons in the area of the carport. Although Deputy Sheriff Medrano did not point his weapon at the detainees, or handcuff any detainee, under the totality of the circumstances none of the people who were directed to go to the area of the carport, including Defendant, was free to leave that area. A reasonable person in Defendant's position would not have felt that as though he was free to leave.

Concerned about being outnumbered by the many detainees, Deputy Sheriff Medrano called for backup. At 9:08 p.m. Deputy Sheriff Brandon Blackmon arrived and immediately began to investigate a suspicious object thrown under a car by one of the detainees. At 9:17 p.m. two other backup officers—Deputy Sheriffs Matthew McCoy and Andrea Taylor—arrived driving separate vehicles. Deputy Sheriff Medrano asked Deputy Sheriff McCoy to determine Defendant's identity and had Deputy Sheriff Taylor search Rachel Page so that she could be

3

transported. By this time the Deputy Marshals were standing outside the mobile home with Rachel Page, who was in handcuffs, waiting for a marked police vehicle to transport her to jail.

Deputy Sheriff McCoy asked Defendant to step from the carport area to a position near Deputy Sheriff McCoy's vehicle. After they were beside the vehicle Deputy Sheriff McCoy asked Defendant for his identification. Defendant said that he had lost it the night before. Deputy Sheriff McCoy then asked Defendant his name and Defendant replied "Brian Maddox." Deputy Sheriff McCoy next asked Defendant if he had any weapons or drugs on his person. Defendant told Deputy Sheriff McCoy that he had a gun. At that point, Deputy Sheriff McCoy handcuffed Defendant's hands behind his back and retrieved a pistol from a shoulder holster located underneath Defendants leather vest. Deputy Sheriff McCoy then asked Defendant if he had anything else. Defendant said that he did. Deputy Sheriff McCoy then recovered a small scale and some methamphetamine from Defendant. Deputy Sheriff McCoy arrested Defendant, placed him inside his vehicle, and read Defendant his *Miranda* rights.

**LEGAL STANDARD**

The Fourth Amendment declares that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." As the language of the Fourth Amendment suggests, not all seizures are precluded, only unreasonable ones. *U.S. v. King*, 990 F.2d 1552, 1556-57 (10th Cir. 1993). In the absence of probable cause for a person's arrest, *Terry v. Ohio*, 392 U.S. 1 (1968) governs whether a seizure or a search of a person is reasonable.

Although *Terry* concerned a brief detention based on a police officer's reasonable suspicion of ongoing criminal activity, the analytical framework of *Terry* is not limited to

investigatory detentions of individuals. *King*, 990 F.2d at 1560. When analyzing whether a detention was lawful, "it is necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen for there is no ready test for determining reasonableness other than by balancing the need to search or seize against the invasion which the search or seizure entails." *Terry*, 392 U.S. at 20-21 (internal quotations and punctuation omitted). However, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.

**ANALYSIS**

The initial question posed in this case is whether Deputy Sheriff Medrano lawfully detained Defendant outside the trailer home at 5701 Douglas S.W. while the Deputy Marshals were inside the residence arresting Rachel Page. Plaintiff asserts that "[f]imly entrenched in the *Terry* landscape is the principle that an officer may lawfully detain someone on grounds of officer safety without suspicion of criminal activity." Doc. No. 38 at 2. Defendant contends that he could be lawfully detained only if Deputy Sheriff Medrano possessed a reasonable belief that Defendant was involved in criminal activity. Neither party's response to the question is wholly satisfactory. Plaintiff would grant Deputy Sheriff Medrano more authority than the Fourth Amendment permits, while Defendant's view of Deputy Sheriff Medrano's ability to detain a person under the Fourth Amendment is too restricted.

Plaintiff's initial argument that safety concerns alone permit a police officer to detain an individual any time that the police officer believes that the individual possesses a weapon is not the law of the land. The Supreme Court rejected any notion that the Fourth Amendment has a

"firearm exception" in *Florida v. J.L.*, 529 U.S. 266, 272 (2000) (holding that a bare-bone tip that a person is armed with a weapon would not permit the police to stop or detain that individual). *J.L.* reaffirmed the fundamental requirement of Fourth Amendment law that a person has to have been "legitimately stopped" by the police officer before a protective search of that person may take place. 529 U.S. at 274; *U.S. v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000) (holding that "an officer may not conduct [a] protective search for the purposes of safety until he has" made a lawful stop). The stop requirement arises from *Terry*, which recognized that "in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous." 392 U.S. at 32 (Harlan, J., concurring) (emphasis in original). Hence, officer safety, by itself, will not support Defendant's detention.

Plaintiff also argues that Deputy Medrano lawfully seized Defendant under the automatic companion frisk rule. The companion frisk rule permits a police officers to seize and frisk any companion of an arrestee that could harm the police officer. *U.S. v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971) (holding that a "criminal's companions at the time of arrest" can be "constitutionally subjected to the cursory 'pat down' reasonably necessary to give assurance that they are unarmed"). According to Plaintiff, since the police officers had an arrest warrant for Rachel Page, Defendant could be detained and frisked because he was her companion. Plaintiff concedes, however, that the Tenth Circuit Court of Appeals has not adopted the companion frisk rule. Courts within this circuit rely on the totality of the circumstances to determine if the companion of an arrestee may be seized and frisked for weapons. *U.S. v. Shareef*, 100 F.3d

1491, 1506 (10th Cir. 1996) (using a totality of the circumstances approach to determine whether seizure and frisk of an arrestee's companions was appropriate).

Considering all of the circumstances confronting Deputy Medrano when Defendant arrived at 5701 Douglas, S.W., there was no objective reason to believe that Defendant was a companion of Rachel Page. *U.S. v. Santana-Garcia*, 264 F.3d 1188, 1192 (10th Cir. 2001) (noting that the legality of a detention is measured by an objective standard). Defendant did not appear at the scene until after the Deputy Marshals had entered the trailer home to arrest Rachel Page. Deputy Medrano knew from his prior experiences at 5701 Douglas that other persons, especially Richard Buhlre Sr. and Jr., resided at that address. When Defendant arrived there as a passenger in a pick-up truck there was no objective indication that Defendant was there to meet Rachel Page instead of someone else who happened to be living at that address.

Plaintiff has not cited a single case that has applied any version of the companion frisk rule to an unknown individual who happens to stop by a residence after an arrest has commenced. The one case the Court found on point is distinguishable. In *People v. Roach*, 93 Cal. Rptr. 354, 356 (Cal. Ct. App. 1971), the police were conducting a "mass arrest at an apartment known to be the headquarters for the street traffic of dangerous drugs." As everyone, or nearly everyone, inside the apartment, was being arrested, the police reasonably could presume that any person who happened to visit the apartment during the mass arrest had an illicit relationship with an arrestee. Here, however, Defendant's mere appearance at a house, known by police to be a place where criminal activity had occurred, is not enough to impute to Defendant any criminality associated with Rachel Page. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (reaffirming the principle that an "individual's presence in an area of expected criminal activity, standing alone, is

not enough to support a reasonable, particularized suspicion that the person is committing a crime"). Without some objective, articulable reason for Deputy Medrano to associate Defendant with Rachel Page, like traveling together, *Shareef*, 100 F.3d at 1506, being in her company, *U.S. v. Fleet*, 806 F.2d 823, 825 (8th Cir. 1986), or prior knowledge of an existing relationship between the individuals, *U.S. v. Bonds*, 829 F.2d 1072, 1073 (11th. Cir. 1987), the companion frisk rule fails to justify Defendant's detention. A hunch does not equal reasonable suspicion. *Terry*, 392 U.S. at 27.

Plaintiff contends that Deputy Medrano could seize and detain Defendant under the holding of *Michigan v. Summers*, 452 U.S. 692 (1981), and its progeny. In *Summers*, the Court held that, even without an arrest warrant, a police officer could lawfully detain the occupant of a house when the officer had a warrant to search the house for contraband. For several reasons, *Summers* should not apply here. First, the holding in *Summers* was limited to the detention of residents and occupants of the dwelling targeted in the search warrant. Defendant was neither a resident nor an occupant of 5701 Douglas S.W. Second, the holding in *Summers* did not apply to all searches; it was limited to searches for contraband, not "a search for evidence." 452 U.S. at 705 n.20. Here, the police were not looking for contraband, they went to 5701 Douglas S.W. simply to arrest Rachel Page.

The most important distinction, however, is that the search warrant in *Summers* provided an objective determination by a neutral magistrate that a crime was *in progress* at the address described in the warrant. *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990). The arrest warrant here simply indicated that a magistrate judge had decided that there was probable cause to believe Rachel Page, who happened to live at 5701 Douglas S.W., may have committed a crime in the

past. In other words, the bygone criminal act that is associated with an arrest warrant is not the same as an ongoing criminal violation. For this reason the Supreme Court distinguished the search warrant in *Summers* from the arrest warrant context, finding that, by itself, the "existence of the arrest warrant implies nothing about whether dangerous third parties will be found in the arrestee's house." *Id.* Hence *Summers* is not the proper source of authority for Deputy Medrano's detention of Defendant. However, *Maryland v. Buie,* which discusses prophylactic measures that the police may take during a residential arrest, provided that authority.

Under *Buie*, police officers are not forced to ignore the hazards associated with an residential arrest. In *Buie*, the Supreme Court found that the "risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter." 494 U.S. at 333. As an "in-home arrest puts the officers at the disadvantage of being on his adversary's 'turf,'" the Supreme Court concluded that a police officer justifiably may fear an ambush. *Id*. To neutralize the threat of an ambush, the Supreme Court in *Buie* held that the "Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing danger to those on the arrest scene." 494 U.S. at 337.

The lesson of *Buie* is that *Terry's* reasonable suspicion standard continues to "strike[] the proper balance between officer safety and citizen privacy," 494 U.S. at 334 n.2, and governs protective sweeps. As applied here, the issue becomes whether Deputy Medrano had "articulable facts which, taken together with the rational inferences from those facts, would warrant a

reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 334.

Admittedly, *Buie* did not involve the issue presented by this case: whether the police can detain bystanders outside a dwelling while an arrest is occurring inside. *Buie* addressed how a protective sweep affected the privacy interests of an arrestee inside the arrestee's home. However, the possible unexpected attack that concerned the Supreme Court in *Buie* just as easily can be launched by a person outside a dwelling as by someone inside it. And the protective sweep that was sanctioned in *Buie* can be effective only if the police are allowed to detain for a brief period persons who are found during a sweep, inside of or in close proximity to the arrestee's dwelling, in order to neutralize any threat they may pose.

Defendant argues that without a reasonable suspicion that he, in particular, was involved in criminal activity, his detention is the sort of governmental interference that is prohibited by the Fourth Amendment. Whether Deputy Sheriff Medrano's protective detention of Defendant violated the Fourth Amendment depends on "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry*, 392 U.S. at 19. As another court has observed, the "tension between the promises of personal security in the Fourth Amendment to the Constitution and the need for police to be able to protect themselves from concealed weapons every time a suspect is stopped is real and ongoing." *U.S. v. Reid*, 997 F.2dd 1576, 1578 (D.C. Cir. 1993). Under *Terry*, that tension is judged using an objective standard of whether the facts available to the officer at the moment of the seizure would warrant a man of reasonable caution to believe that the action taken was appropriate. 392 U.S. at 22.

Here Deputy Sheriff Medrano had the right to forcibly stop Defendant and the other occupants of the pick-up truck from entering the trailer home because the Deputy Marshals were arresting Rachel Page inside.  Defendant does not argue otherwise.  To protect the safety of the Deputy Marshals executing the arrest warrant, Deputy Sheriff Medrano reasonably maintained the status quo inside the dwelling by preventing anyone from entering it.  Defendant contends, however, that after Deputy Sheriff Medrano informed Defendant that he could not enter the trailer home, Deputy Sheriff Medrano should have allowed Defendant to leave the premises.  *U.S. v. Clay*, 640 F.2d 157, 162 (8th Cir. 1981); *U.S. v. Miller*, 546 F.2d 251, 253 (8th Cir. 1976)(holding that "if the defendant had been permitted to leave as requested, no officer's security problem of any kind would have been presented").

Plaintiff argues that Deputy Sheriff Medrano could detain Defendant during the protective sweep because Deputy Sheriff Medrano reasonably believed that Defendant posed a threat to the law enforcement officers at the scene.  When Deputy Sheriff Medrano told Defendant to go to the area of the carport, the following facts supported Defendant's detention:  (1)  Deputy Sheriff Medrano was at 5701 Douglas S.W. to arrest Rachel Page for felony drug trafficking, (2) the address was known for criminal activity (3) it was getting dark when Defendant arrived in a pick-up truck with two other people, (4) including the occupants of the pick-up truck and the two men already detained, Deputy Sheriff Medrano was outnumbered 5 to 1, and (5) as the pick-up truck came to a stop, Defendant reached downward toward the floorboard of the truck.

Deputy Sheriff Medrano testified that under the circumstances—impending darkness, being outnumbered, and the dangerousness of the location—he considered Defendant's movement inside the pick-up truck to be a threat to officer safety.  Deputy Sheriff Medrano

11

indicated if Defendant had been allowed to leave with a weapon at his disposal, Defendant could have stopped, turned, and fired upon the police officers.  Of course, Deputy Sheriff Medrano's fear that Defendant could ambush the police officers on the scene can be credited only to the extent that it was reasonable to believe that Defendant was armed and dangerous.  *King*, 990 F.2d at 1561 ("The governmental interest in the safety of police officers outweighs the individual's Fourth Amendment interests when an officer has an objective basis to believe that the person being lawfully detained is armed and dangerous.").

      Defendant argues that fact that the address was known to be dangerous is not relevant to Deputy Sheriff Medrano's fear that Defendant presented a danger to the police officers.  Defendant cites to *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979), for the proposition that a person's mere presence at a place known for criminal activity cannot support a reasonable belief that Defendant was armed and dangerous.  However, *Ybarra* took place in a tavern opened to members of the general public, whereas this encounter happened at a remote, private home that was notorious for criminal conduct.  The law permits Deputy Sheriff Medrano to make the common sense inference that a person located at a private home which is associated with drugs, robbery, and homicide is likely to be armed.  *Cf. Reid*, 997 F.2d at 1579 (observing that "common sense suggests that there is a much greater likelihood that a person found in a small private residence containing drugs will be involved in the drug activity occurring there than an individual in a public tavern").

      Given the totality of the circumstances, the Court cannot say that Deputy Sheriff Medrano's belief that Defendant may have been armed was unreasonable.  Hence, Deputy Sheriff Medrano's detention of Defendant in order to abate any safety hazard that Defendant could have

posed if allowed to depart the scene did not violate the Fourth Amendment. *Reid*, 997 F.2d at 1579 (holding that "were it not for the specific testimony of [the police officer] that he felt endangered by [defendant's] potential presence behind the police officers as they were seeking to execute the search warrant, the government could not prevail"); *Thompson v. City of Lawrence*, Civ. Nos. 93-2253-KHV & 93-2310-KHV, 1994 WL 262598, at * 10 (D. Kan. May 19, 1994) (concluding "that the Fourth Amendment does not prohibit law enforcement officers from detaining innocent bystanders for a reasonable period of time where necessary to secure the scene of a valid arrest of a suspected felon when they have a reasonable belief that firearms may be involved") (unpublished opinion), *aff'd* 58 F.3d 1511, 1517 (10th Cir. 1995).

Because Deputy Medrano lawfully detained Defendant so that the police officers could execute Rachel Page's arrest warrant in reasonable safety, the police officers could ask Defendant if he possessed a firearm without violating the Fourth Amendment. *U.S. v. Holt*, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc); *U.S. v. Wise*, No. 88-5386, WL 107838, at * 1 (9th Cir. Sept. 12, 1989) (unpublished opinion). In *Holt*, the Court of Appeals for the Tenth Circuit held that a police officer was entitled to question a lawfully detained motorist about loaded weapons "even when the officer lacks particularized suspicion that the motorist possesses loaded weapons and regardless of whether the officer subjectively fears the motorist." 264 F.3d at 1226 (Ebel, J.). Defendant attempts to distinguish *Holt* as a decision that applies only to automobile stops. However, there is no logical reason why *Holt's* holding should not apply to any lawfully detained individual when the situation is potentially dangerous to law enforcement officers. 264 F.3d at 1229 (addressing the case at a higher level of generality by framing the issue simply as "a nonconsensual police-citizen encounter") (Briscoe, J.). And here, unlike *Holt*, Deputy Sheriff

Medrano's question about weapons was justified by the reason for Defendant's initial seizure—officer safety. That is, under *Terry*, the question "was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20.

Nor was the length of Defendant's detention unnecessarily prolonged. The law enforcement officers held Defendant until they could safely depart with Rachel Page. That time was extended in part because the police officers had to wait for a marked police vehicle to arrive to transport Rachel Page. The first back-up officer to arrived immediately became involved with investigating an object that one of the detainees had thrown under a parked car. That investigation discovered drug paraphernalia under the car and ultimately led to the discovery of a firearm in a vehicle belonging to that detainee.

When two other police vehicles arrived a few minutes later, the driver of one was assigned the task of questioning Defendant while the driver of the other, who was the first female law enforcement officer on the scene, performed a search of Rachel Page incident to her arrest. After the female police officer finished her search of Rachel Page she immediately joined Deputy Sheriff McCoy where she overheard Deputy Sheriff McCoy ask Defendant if Defendant possessed a firearm. Defendant stated that he had "a gun right here," which was concealed under Defendant's leather vest. Tr. at 213. Because there is no evidence that the police officers were dilatory in transporting Rachel Page, the length of Defendant's detention, approximately 30 minutes from his arrival on the scene until Deputy McCoy questioned him about a weapon, did not run afoul of the Fourth Amendment. *Shareef*, 100 F.3d at 1507 (10th Cir. 1996) (holding that a 45 minute detention was reasonable under *Terry*).

Once Deputy Sheriff McCoy determined that Defendant possessed a concealed weapon, Deputy Sheriff McCoy was justified in continuing to inquire about anything else that he felt he needed to know. Even if his additional questions were construed as being unrelated to officer safety they were harmless. Since Defendant was subject to arrest for possessing a concealed weapon, the contraband found on Defendant's person would have been inevitably discovered during the search of Defendant incident to his arrest, and it should not be suppressed.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Evidence Seized in Violation of the Fourth Amendment (Doc. No. 21), is DENIED.

_____
CHIEF UNITED STATES DISTRICT COURT JUDGE